**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OKLAHOMA**

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| | ) |
| Plaintiff/Respondent, | ) |
| | ) |
| v. | ) Case No.   17-CR-00010-GKF |
| | )                  19-CV-00501-GKF-JFJ |
| SHAWN CHRISTOPHER GORRELL, | ) |
| | ) |
| Defendant/Petitioner. | ) |

<u>**OPINION AND ORDER**</u>

This matter comes before the court on the Motion Under 28 U.S.C. § 2255 to Vacate, Set

Aside, or Correct Sentence by a Person in Federal Custody [Doc. 105] of defendant/petitioner

Shawn Christopher Gorrell.   For the reasons set forth below, the motion is denied.

**I.      Background/Procedural History**

On February 7, 2017, a grand jury returned an Indictment charging Mr. Gorrell with three

counts of wire fraud pursuant to 18 U.S.C. § 1343, as well as a wire fraud forfeiture allegation

seeking up to $2,500,000.00 of lost investor funds.   [Doc. 2].   The charged crimes generally

related to allegations that Mr. Gorrell devised a scheme to defraud and obtain money and property

by means of false and fraudulent pretenses, representations, and promises, and transmitted certain

writings to be transmitted by means of wire communications—in the form of wire transfers—in

interstate commerce for purposes of executing the scheme (Scheme).   [*Id.* at p. 1].   The

Indictment included the following specific factual allegations:

From 2002 to 2012, Mr. Gorrell was an insurance agent, doing business in the State of

Oklahoma, who represented several nationally known companies.   During that time, Mr. Gorrell

established strong business and social relationships with various clients, a number of whom were

dentists in the Tulsa, Oklahoma area, for whom his father provided accounting services.   During that time, Mr. Gorrell was also a licensed securities broker, registered with and whose activities were subject to regulation by the Financial Industry Regulatory Authority (FINRA).

In May of 2007, one the nationally known insurance companies [1] that Mr. Gorrell represented terminated his agency contract due to his questionable handling of a client's account. However, Mr. Gorrell continued to represent other nationally known insurance companies.

In December of 2007, in addition to continuing his work as an insurance agent, Mr. Gorrell established a business, Gorrell Financial, Inc. (GFI), for the purpose of providing financial advice and promoting financial products and investments to clients, and of engaging in financial ventures.

In November of 2008, FINRA suspended Mr. Gorrell and, in or about April 2009, barred Mr. Gorrell from associating with any FINRA member in any capacity.

During this time, Mr. Gorrell frequently engaged in gambling at Tulsa-area casinos and he used more funds to gamble than either his winnings or his regular professional income provided. One casino in the Tulsa area barred Mr. Gorrell from further gambling due to his use of Social Security numbers not assigned to him. [2]

Mr. Gorrell also frequently engaged in day trading through an E*TRADE account that he established for himself.   Under the terms of the account agreement, Mr. Gorrell was allowed to trade securities using margin, or funds borrowed from E*TRADE, as long as he maintained certain balances in his account.   If his account fell below the specified balances, Mr. Gorrell was subject

---

[1] The evidence at trial revealed this company to be Northwestern Mutual.

[2] The evidence at trial demonstrated this casino to be the Muscogee (Creek) Nation's River Spirit Casino Resort.

2

to a margin call, that is, a demand by E*TRADE that Mr. Gorrell deposit additional funds into his account in order to maintain his account privileges.   Mr. Gorrell lost more funds than he earned due to day trading, and he used more funds to day trade than either his day trading earnings or his regular professional income provided.

From February of 2009 to October of 2012, in order to obtain funds to use for gambling and day trading, Mr. Gorrell fraudulently induced several of his insurance clients to move funds from their insurance products with nationally known insurance companies to other investment opportunities which Mr. Gorrell would purportedly manage for their benefit through GFI, including: (1) trading in life insurance policies, commonly referred to as life settlements; (2) trading in business tax credits and net operating losses; and (3) establishing Individual Retirement Accounts (IRAs).   Mr. Gorrell also fraudulently induced those clients to encourage their relatives and friends to invest funds in these investment opportunities.

Mr. Gorrell promoted these investment opportunities to his clients, their friends and relatives by means of the following material false and fraudulent pretenses, representations, and promises, among others that: (1) the investments entailed little to no risk; (2) the account in Gorrell's name at E*TRADE, to which investors transferred their funds, was merely a conduit by means of which Mr. Gorrell would transfer the investors' funds to their chosen investments; (3) the investments would return 10% to 20%, and sometimes more, on funds invested; (4) the investments operated successfully and generated returns upon the funds invested; and (5) the periodic payment to investors of funds, which purported to be real returns on their funds invested from the operation of the investment ventures.   Mr. Gorrell knew that these material false and fraudulent pretenses, representations, and promises were not true at the time he made them to and

utilized them with investors.

Further, in promoting these investments to his clients, their friends and relatives, Mr. Gorrell fraudulently did not provide material information, including the following:   (1) in or about 2007, Northwestern Mutual terminated Mr. Gorrell due to his questionable handling of client funds; (2) in November 2008, FINRA suspended Mr. Gorrell and, in April 2009, barred Mr. Gorrell from associating with any FINRA member in any capacity; (3) Mr. Gorrell used substantial amounts of the investor funds to pay for expenses that were personal and otherwise unrelated to their investments; (4) Mr. Gorrell used substantial amounts of the investor funds for gambling; (5) Mr. Gorrell lost substantial amounts of the investor funds in gambling; (6) Mr. Gorrell was barred from River Spirit Casino Resort; (7) Mr. Gorrell used substantial amounts of the investor funds for day trading in his personal E*TRADE account; (8) Mr. Gorrell used substantial amounts of the investor funds to meet margin calls made by E*TRADE against his account; (9) Mr. Gorrell lost substantial amounts of the investor funds in day trading in his personal E*TRADE account; (10) Mr. Gorrell used substantial amounts of the investor funds to make payments of purported investment returns to investors; and (11) on his personal federal income tax returns, Mr. Gorrell claimed losses, caused by his use of investor funds in day trading, against his personal income. Mr. Gorrell failed to provide the investors with this information, well knowing that none of them had authorized him to use their investment funds to engage in gambling and day trading, and for the payment of expenses that were personal to him and otherwise unrelated to their investments.

In furtherance of the Scheme, wire transfers were made from the bank accounts of investors to Mr. Gorrell's E*TRADE account as stated below:

4

| Count | Date | Investor | Amount |
|-------|------|----------|--------|
| 1 | 07/06/12 | L.S. | $270,000 |
| 2 | 07/11/12 | J.C. | $395,000 |
| 3 | 09/14/12 | W.S. | $155,000 |

Evidence adduced at trial demonstrated that Investor L.S. was Dr. Laurie Southard, Investor J.C. was Dr. Jonathan Cooper, and Investor W.S. was Dr. Wade Sessom.

The Indictment further alleged that Mr. Gorrell fraudulently protected and concealed the Scheme by means of materially false and fraudulent pretenses, representations, and promises that lulled investors and delayed their questions about and requests for the return of funds, including but not limited to the following: (1) payments to investors, to foster their belief that the investments were operating as promoted when, in fact, as Mr. Gorrell well knew, the payments were derived from investor funds or other sources unrelated to the purported investments; (2) funds invested were readily available to investors whenever they wanted those funds returned when, in fact, as Mr. Gorrell well knew, he had used and lost the investor funds in gambling and day trading and by using them for the payment of expenses that were personal to him and otherwise unrelated to investments; (3) Mr. Gorrell would need approximately thirty days to complete the process to return funds to investors, when requested; and (4) Mr. Gorrell had been diagnosed with cancer and might have only six months to live.   [Doc. 2].

At the time of the Indictment, Mr. Gorrell was residing in the District of Montana and, on July 24, 2017, he was arrested in that district.   [Doc. 8].   The government moved to detain Mr. Gorrell pending trial.   [*Id.* at p. 2].

Mr. Gorrell appeared in person in the Northern District of Oklahoma before U.S. Magistrate Judge Paul Cleary on July 31, 2017.   [Doc. 4].   Attorney Stan Monroe appeared on

5

Mr. Gorrell's behalf during the arraignment as retained counsel.   [*Id.*].   Mr. Monroe has been a member of the Oklahoma bar for over forty years and has engaged extensively in criminal and civil litigation in both federal and state courts, at the trial and appellate levels.   [Doc. 114-1, p. 2, ¶¶ 1-2].   During his practice, he has handled thousands of hearings and approximately 150 jury trials.   [*Id.* ¶ 2].   Mr. Monroe is a Fellow in the American College of Trial Lawyers.   [*Id.*].

During the arraignment, although the government had moved to detain, Mr. Gorrell was released on conditions of supervision, which allowed Mr. Gorrell to return to his family and job in Montana.   [Doc. 5; Doc. 114-1, pp. 3-4, ¶ 5].

On August 1, 2017, the court entered a Scheduling Order setting Mr. Gorrell's case for trial on September 18, 2017.   [Doc. 7].   Within a matter of days, Mr. Monroe had conducted a cursory review of discovery and determined that, due to the voluminous discovery involved, the Scheduling Order did not provide sufficient time to review, complete his investigation, and make a decision as to what, if any, pre-trial motions should be filed.   [Doc. 10; Doc. 114-1, p. 4, ¶ 6].   Accordingly, Mr. Monroe requested that the court declare the case complex and extend all Scheduling Order deadlines by one-hundred and twenty (120) days.   [*Id.*].   The court granted the motion, declared the case complex, and continued the trial to the January 16, 2018 trial docket. [Doc. 14; Doc. 15].

On October 10, 2017, the grand jury returned a Superseding Indictment against Mr. Gorrell. [Doc. 18].   The Superseding Indictment added three counts of tax evasion pursuant to 26 U.S.C. § 7201.   [*Id.* at pp. 10-15].   Count Four related to the 2009 calendar year, Count Five related to the 2011 calendar year, and Count Six related to the 2012 calendar year.   [*Id.*].   With respect to each year, the Superseding Indictment included allegations that Mr. Gorrell caused investor funds

6

to be deposited into various accounts at banks and E*TRADE that he maintained in his own name and in the name of his financial services company, GFI, thereby commingling the investor funds with his personal funds and converting them to his own use; caused the payment of personal expenses from investor funds that had been deposited into the various financial accounts that he maintained at banks and at E*TRADE; caused the withdrawal of large amounts of cash from the various financial accounts that he maintained at banks and at E*TRADE; stopped using tax preparation services provided to him for free by his father, and instead engaged new tax preparers, located in Florida, who were previously unfamiliar with his business ventures, financial accounts, personal income and expenses; provided his new tax preparers with materially incomplete and misleading information about his business ventures, financial accounts, personal income and expenses; and caused the preparation of a materially false and fraudulent income tax Form 1040 for himself and his wife, which Mr. Gorrell caused to be signed and submitted to the Internal Revenue Service.  [*Id.*].  Mr. Gorrell waived his appearance at arraignment on the Superseding Indictment and entered a plea of not guilty.  [Doc. 21].

On December 1, 2017, Mr. Monroe filed a Motion to Dismiss the Superseding Indictment Due to Unreasonable Delay [Doc. 22] and a Motion to Produce Exculpatory Evidence [Doc. 23] pursuant to *Brady v. Maryland,* 373 U.S. 83 (1963).  The motion to produce exculpatory evidence specifically sought "any evidence in the possession of the Government, or which is readily available to it, which reveals that the Government witnesses, especially Dr. Cooper, were pleased with Mr. Gorrell's efforts on their behalf," including emails detailing a trip to the Caribbean gifted to Mr. Gorrell and his wife by Dr. Cooper, as well as power of attorney forms executed by Dr. Cooper and his wife, Dr. Brenda Chockley, authorizing Mr. Gorrell to invest with E*TRADE on

7

their behalf.   [Doc. 23, p. 2].

The motions were heard during the pretrial conference, which was held on January 4, 2018. [Doc. 29; Doc. 90].   The court denied the motion to dismiss. [Doc. 29; Doc. 90, pp. 2-7].   With respect to the *Brady* motion, Mr. Monroe represented that the motion was moot "for the most part" as the government had produced power of attorney forms from E*TRADE executed by Dr. Chockley and Dr. Cooper.   [Doc. 90, p. 8].   Mr. Monroe also noted that the government had informed him that records related to the vacation gift no longer existed or they were unable to get them and "[w]e couldn't find them on our server either."   [*Id.*].   Mr. Monroe went on to explain that, since Mr. Gorrell had moved from Oklahoma to Montana, he has a different email server and was unable to find any emails from Dr. Cooper "praising him for his outstanding work on his behalf."   [*Id.* at p. 11].   The government asserted that, for its part, it believed the *Brady* motion was moot and assured the court that it would provide Mr. Monroe additional material, if any, as soon as it became available.   [*Id.* at pp. 9-10].   Based on the representations of the parties, the court determined the motion to produce exculpatory evidence was moot.   [*Id.* at pp. 12-13].

In advance of trial, Mr. Monroe filed nineteen proposed jury instructions on Mr. Gorrell's behalf.   [Doc. 32].   Additionally, Mr. Monroe submitted proposed *voir dire* on Mr. Gorrell's behalf, which included twenty-eight separate inquiries.   [Doc. 33].

A six-day jury trial began on January 16, 2018.   [Doc. 38 thru Doc. 46].   The jury returned a verdict finding Mr. Gorrell guilty as to all six counts of the Superseding Indictment.   [Doc. 49].

In April of 2018, the court sentenced Mr. Gorrell to sixty-four months imprisonment as to Counts One through Three and sixty months as to each of Counts Four through Six, each count to run concurrently with the other.   [Doc. 65].

Mr. Gorrell appealed the Judgment and Sentence to the Tenth Circuit Court of Appeals. [Doc. 66; Doc. 70].   Mr. Monroe did not represent Mr. Gorrell in his appeal.   [Doc. 71].   The Tenth Circuit affirmed this court's Judgment.   [Doc. 101 thru Doc. 103].

Mr. Gorrell now collaterally attacks the Judgment and Sentence pursuant to 28 U.S.C. § 2255, asserting a single ground for relief: ineffective assistance of counsel.   [Doc. 105].   To that end, Mr. Gorrell attaches 176 additional pages to his Form AO 243 (Rev. 09/17).   The attachment includes a thirty-seven page brief, self-made exhibits, and summaries of those exhibits "outlining what is being illustrated."   [*Id.* at p. 49].   Mr. Gorrell alleges that "Mr. Monroe fell well below the objective standard of reasonableness" in six general areas: (1) failure to develop and present available and relevant evidence; (2) failure to subpoena and interview key witnesses; (3) failure to utilize expert witness; (4) failure to prepare a defense or trial strategy; (5) failure to subject the government's case to the adversarial testing process; and (6) failure to investigate.   [Doc. 105, p. 14].

The government responded in opposition to Mr. Gorrell's § 2255 motion. [Doc. 113; Doc. 114].   Mr. Gorrell subsequently filed an eighty-nine page reply to the government's response. [Doc. 115].   The motion is ripe for the court's determination.[3]

## II.   Standard

Pursuant to 28 U.S.C. § 2255(a), "[a] prisoner in custody under sentence of a court established by Act of Congress claiming the right to be released upon the ground that the sentence was imposed in violation of the Constitution or laws of the United States . . . may move the court

---

[3] No evidentiary hearing is necessary as "the motion and files and records of the case conclusively show that the prisoner is entitled to no relief."   *United States v. Lopez,* 100 F.3d 113, 119 (10th Cir. 1996) (quoting *United States v. Galloway*, 56 F.3d 1239, 1240 n.1 (10th Cir. 1995)).

which imposed the sentence to vacate, set aside or correct the sentence."  The Sixth Amendment to the U.S Constitution requires that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to have the Assistance of Counsel for his defence."  U.S. Const. amend. VI.  "[T]he right to counsel is the right to the effective assistance of counsel." *Strickland v. Washington*, 466 U.S. 668, 686 (1984) (quoting *McMann v. Richardson*, 397 U.S. 759, 771 n.14 (1970)).  "In giving meaning to the requirement, however, [the court] must take its purpose—to ensure a fair trial—as the guide.  The benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." *Id.*

To determine an ineffective assistance of counsel claim, the court must apply the two-prong test articulated by the U.S. Supreme Court in *Strickland*.  *United States v. Barrett,* 797 F.3d 1207, 1213 (10th Cir. 2015).

Pursuant to the *Strickland* test, first, the movant "must show that counsel's performance was deficient."  *Strickland,* 466 U.S. at 687.  Deficiency is "a demanding standard," *Barrett,* 797 F.3d at 1213, and requires the movant to show that defense counsel's representation "fell below an objective standard of reasonableness."  *Strickland*, 466 U.S. at 688; *see also id.* ("[T]he performance inquiry must be whether counsel's assistance was reasonable considering all the circumstances.").  Review under this first prong is "highly deferential."  *Byrd v. Workman,* 645 F.3d 1159, 1168 (10th Cir. 2011) (quoting *Hooks v. Workman*, 606 F.3d 715, 723 (10th Cir. 2010)).  This "court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance."  *Strickland,* 466 U.S. at 689.

Second, movant must demonstrate "that the deficient performance prejudiced the defense."

10

*Strickland,* 466 U.S. at 687.   The prejudice showing requires movant to demonstrate "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."   *Barrett*, 797 F.3d at 1214 (quoting *United States v. Rushin,* 642 F.3d 1299, 1302 (10th Cir. 2011)).   "Courts are free to address these two prongs in any order, and failure under either is dispositive."   *Id.* (quoting *Byrd,* 645 F.3d at 1168).

## III.    Analysis

As previously stated, Mr. Gorrell alleges that Mr. Monroe fell below the objective standard of reasonableness in six general areas.   Based upon the court's review of Mr. Gorrell's lengthy briefs, many of the specific arguments raised with respect to each general category of objection overlap or are duplicative of those raised in other categories.   For example, Mr. Gorrell argues that Mr. Monroe expended insufficient time reviewing discovery in his argument directed to the following general areas of alleged errors: (1) failure to present available and relevant evidence; (2) failure to prepare a defense or trial strategy; and (3) failure to subject the government's case to the adversarial testing process.   To avoid burdensome and duplicative efforts, the court has endeavored to consider the specific allegations raised by Mr. Gorrell only with respect to the general category to which it is most relevant.   Going back to the court's prior example, the court considers Mr. Monroe's time spent reviewing discovery only with respect to Mr. Gorrell's contention that Mr. Monroe failed to prepare a defense or trial strategy.

Further, for ease of analysis, the court has re-ordered Mr. Gorrell's general areas of objections as follows:

A.    Mr. Gorrell's fourth general objection (failure to prepare a defense or trial strategy)

B.    Mr. Gorrell's second general objection (failure to subpoena and interview

key witnesses)

C.     Mr. Gorrell's sixth general objection (failure to investigate)

D.     Mr. Gorrell's fifth general objection (failure to subject the government's case to the adversarial testing process)

E.     Mr. Gorrell's third general objection (failure to utilized an expert witness)

F.     Mr. Gorrell's first general objection (failure to develop and present available and relevant evidence)

Finally, although included in Mr. Gorrell's sixth objection (failure to investigate), the court separately considers the assertion that Mr. Monroe did not advise Mr. Gorrell of the applicable sentencing guidelines or explain the potential for a plea agreement in Subsection G.

A.     *Failure to Prepare a Defense or Trial Strategy*

Mr. Gorrell's overarching argument with respect to this issue is that Mr. Monroe spent insufficient time preparing Mr. Gorrell's defense but, instead, improperly relied on the government's evidence, documents, and witnesses.   The record demonstrates that this is false.

First, Mr. Monroe reviewed the extensive document discovery provided by the government.   Mr. Gorrell criticizes the time spent reviewing based solely on Mr. Monroe's time records and Mr. Gorrell's personal calculations of time spent per page.   However, Mr. Monroe explains that, based on his experience in handling fraud cases, he understood that he "did not need to examine word-for-word or number-for-number every page that the government provided in discovery" but, instead, could obtain the necessary information by "becoming familiar with the documents in categories with, of course, particular attention being given to certain pages and documents, as the facts of the case demanded."   [Doc. 114-1, p. 5, ¶ 8].   Moreover, Mr. Monroe states that the government provided him summaries of the material on which it would rely at trial

and he "became quite familiar with those summaries."   [*Id.*].   Finally, Mr. Monroe avers that the time records on which Mr. Gorrell relies do not accurately reflect his total time reviewing discovery as he did not bill Mr. Gorrell for all time spent.   [*Id.*].

The court concludes that Mr. Monroe's approach to reviewing the extensive discovery provided by the government was imminently reasonable under the circumstances, particularly in light of the U.S. Supreme Court's recognition that the significance of counsel's preparation time may be "reduced by the nature of the charges against [movant]."   *United States v. Cronic,* 466 U.S. 648, 664 (1984).   There, the Court reasoned as follows:

> Neither the period of time that the Government spent investigating the case, nor the number of documents that its agents reviewed during that investigation, is necessarily relevant to the question whether a competent lawyer could prepare to defend the case in [the relevant timeframe].   The Government's task of finding and assembling admissible evidence that will carry its burden of proving guilt beyond a reasonable doubt is entirely different from the defendant's task in preparing to deny or rebut a criminal charge.   Of course, in some cases the rebuttal may be equally burdensome and time consuming, but there is no necessary correlation between the two.   In this case, the time devoted by the Government to the assembly, organization, and summarization of the thousands of written records evidencing the two streams of checks flowing between the banks in Florida and Oklahoma unquestionably simplified the work of defense counsel in identifying and understanding the basic character of the defendants' scheme.   When a series of repetitious transactions fit into a single mold, the number of written exhibits that are needed to define the pattern may be unrelated to the time that is needed to understand it.

*Id.* at 663-64 (internal footnote omitted).   Here, the government provided Mr. Monroe with summaries of the exhibits on which it intended to rely, greatly simplifying Mr. Monroe's work. Further, Mr. Monroe was able to review the documents based on categories.   Thus, in this case, it is clear that the sheer number of pages provided by the government is not reflective of the time necessary to understand the documents.

Mr. Gorrell also alleges that Mr. Monroe failed to review certain discovery provided by

13

the government—specifically, documents from the Tax Defense Network. However, Mr. Gorrell offers only baseless, conclusory allegations that Mr. Monroe did not review the discovery, unsubstantiated by any evidence. Mr. Monroe avers that he reviewed the documents and specifically cross-examined Tax Defense Network representatives Mark Giles and Nayadali Maldonado-Hurst regarding them. [Doc. 114-1, p. 10, ¶ 14]; *see also* [Doc. 94, pp. 184-87].

Second, in addition to reviewing the discovery provided by the government, Mr. Monroe pursued *yet more* discovery from the government. Mr. Monroe filed the motion to produce exculpatory evidence which specifically requested emails between Dr. Cooper and Mr. Gorrell, as well as power of attorney forms executed by Dr. Cooper and Dr. Chockley. [Doc. 23]. The motion resulted in the government producing power of attorney forms from E*TRADE executed by Dr. Chockley and Dr. Cooper. [Doc. 90, p. 7].

Third, Mr. Monroe also retained the services of certified public accountant Gretchen Archer to assist him in his review of the discovery, shaping his understanding of the facts, and in formulation of trial strategy. [Doc. 114-1, p. 6, ¶ 9]. As necessary, Ms. Archer identified additional documentation which she felt might be useful. [Doc. 114-2, p. 4, ¶ 7].

Mr. Gorrell contends that Mr. Monroe "never used any material that Gorrell or Archer gave to him to put his own [defense] theory together." [Doc. 105, p. 29]. However, Mr. Gorrell's allegation is baseless. Mr. Monroe avers that he communicated with Ms. Archer on a regular basis throughout trial preparations, and, further, that Ms. Archer communicated with both he and Mr. Gorrell on conference calls. [Doc. 114-1, pp. 6-7, ¶ 9]. Mr. Monroe also states that he regularly communicated with Mr. Gorrell regarding his case, including who the defense might call as witnesses, what documents might be used as exhibits, and what questions to ask witnesses

14

presented by the government.   [*Id.* at p. 8, ¶ 11].   Mr. Monroe's time records, which Mr. Gorrell attaches to his motion as Exhibit J-1, as well as the emails appended by Mr. Monroe to his affidavit, substantiate Mr. Monroe's regular communications with both Mr. Gorrell and Ms. Archer, including a teleconference between Mr. Monroe, Mr. Gorrell, and Ms. Archer on one of the days of Mr. Gorrell's trial.   [Doc. 105, pp. 229-39; Doc. 114-1, pp. 23-49].   The record is clear that Mr. Monroe sufficiently reviewed the discovery in this case, including incorporating the opinions of Mr. Gorrell and Ms. Archer.

Apart from the time spent reviewing discovery, Mr. Gorrell complains that Mr. Monroe expended insufficient time conducting legal research of the charges against him.   Specifically, Mr. Gorrell contends that "[i]f he would have researched the laws at all, he would have known that Tax Fraud was a lesser charge versus suggesting that the prosecution use a superseding indictment that had tax evasion in it which carries a much longer potential sentence."   [Doc. 105, p. 29].   At the outset, the court must note that Mr. Gorrell's allegation that Mr. Monroe "suggest[ed]" that the government pursue a Superseding Indictment—which included additional charges against his client—is completely unsubstantiated.   Further, it is well-established that what charge to file or bring before the grand jury generally rests entirely in the prosecutor's discretion, not defense counsel.   *See Bordenkircher v. Hayes,* 434 U.S. 357, 364 (1978).   Moreover, the court notes that Mr. Monroe moved to dismiss the case for unreasonable delay.   [Doc. 22].   Finally, based on its review of Mr. Monroe's time records and his affidavit, the court is not convinced that only those time entries specifically designated as "Legal Research" on which Mr. Gorrell relies accurately reflect the time Mr. Monroe spent conducting some manner of legal research.   For example, Mr. Monroe attributes 1.5 hours to drafting proposed jury instructions and *voir dire*.   [Doc. 105, p.

237].   The preparation of proposed jury instructions necessarily requires legal research.

For all of the reasons discussed above, the court concludes that Mr. Monroe's legal research was objectively reasonable.   Nor can Mr. Gorrell establish prejudice by any alleged deficiency.

Mr. Gorrell's remaining specific allegations as to "failure to prepare a defense or trial strategy" relate to Mr. Monroe's trial presentation of the nature of the investments and trading that took place between investors and Mr. Gorrell.   The court will consider this argument in Section F., Failure to Develop and Present Available and Relevant Evidence.   The court next turns to Mr. Gorrell's general assertion that Mr. Monroe failed to perform a sufficient factual investigation, including the witnesses, documents, and other evidence, he believes should have been pursued.

B.      *Failure to Subpoena and Interview Key Witnesses*

Mr. Gorrell faults Mr. Monroe for not interviewing the government's identified witnesses in advance of trial and for failing to interview "a multitude of individuals that would have been crucial to Mr. Gorrell's defense."   [Doc. 105, p. 22].   Mr. Gorrell identifies Don Quint, Carrie Sessom, Jim Highfill, Bobby Bratton, James Ronk, Maureen Crotty, David Francis, Patrick Gorrell, Michael Gorrell, Thomas Pitts, and Lawrence Littlefield as potential witnesses who should have been interviewed.[4]   Only Patrick Gorrell testified at trial.

With respect to the potential witnesses who allegedly should have been interviewed and who did not testify at trial, Mr. Gorrell offers nothing other than his own unsupported assertions that the witnesses would have testified in his favor during trial.   "In the specific context of an

---

[4] Mr. Gorrell also makes vague assertions that "representatives of Tax Defense Network" and "other clients" should have been interviewed.   Such conclusory allegations are insufficient to demonstrate a constitutional deficiency.

uncalled witness, [movant] must also show 'that the testimony of an uncalled witness would have been favorable' and that 'the witness would have testified at trial.'"   *United States v. Jordan*, 461 F. App'x 771, 775 (10th Cir. 2012) (unpublished) (quoting *Snow v. Sirmons,* 474 F.3d 693, 731 n.42 (10th Cir. 2007)).[5]   "[Mr. Gorrell's] unsupported descriptions, which also fail to show that the uncalled witnesses would have testified at trial, are insufficient to show prejudice." *United States v. Gallant*, 562 F. App'x 712, 715 (10th Cir. 2014); *see also Snow*, 474 F.3d at 731 n.42; *United States v. Decoster,* 624 F.2d 196, 211 (D.C. Cir. 1976) ("abstract" and "speculative" possibility that investigation of potential witnesses would have resulted in favorable testimony is insufficient to demonstrate that counsel's omission probably affected the outcome of trial); *United States v. Cox,* 782 F. App'x 674 (10th Cir. 2019) (unpublished).   For this reason, Mr. Gorrell fails to establish prejudice stemming from the uncalled witnesses and therefore Mr. Monroe's representation was not constitutionally deficient in this regard.   *Strickland,* 466 U.S. at 700 ("Failure to make the required showing of either deficient performance or sufficient prejudice defeats the ineffectiveness claim.").[6]

Although the court need not further analyze the effectiveness of Mr. Monroe's investigation of witnesses based on Mr. Gorrell's speculative assertions of potentially favorable trial testimony, the court takes special consideration of Mr. Gorrell's arguments regarding potential

---

[5] "Unpublished decisions are not precedential, but may be cited for their persuasive value."   10th Cir. R. 32.1(A).

[6] Moreover, Mr. Monroe avers that he based his cross-examination of government witnesses upon the government's memoranda of interviews that had been provided to him in discovery, a method that he learned was effective to make the points needed for the defense through his years of experience.   [Doc. 114-1, pp. 10-11, ¶ 15].   Mr. Monroe's conduct was objectively reasonable in this regard.

witnesses Thomas Pitts and Lawrence Littlefield.   Mr. Gorrell faults Mr. Monroe for not contacting and interviewing Mr. Pitts, described as "critical," and Mr. Littlefield, asserted to be "key," because they would have allegedly demonstrated the government's "inconsistencies" in characterizing individuals as investors or non-investors, resulting in an accounting favorable to the government's theory.   [Doc. 105, pp. 26-27, 45-46; Doc. 115, p. 12, 28-29, 38, 41, 61-62].   Mr. Gorrell specifically takes issue with Government Exhibit O1-15, which illustrated a running balance of Mr. Gorrell's bank accounts and designated some monies "investor funds" and other monies "non-investor funds."   [*Id.* at pp. 69-103].   Mr. Gorrell fails to demonstrate ineffective assistance of counsel with respect to the investigation of Mr. Pitts and Mr. Littlefield for several reasons.

First, Mr. Monroe did, in fact, communicate with Mr. Pitts prior to trial.[7]   [Doc. 114-1, p. 11, ¶ 17].   Based on that communication, Mr. Monroe concluded that Mr. Pitts would not be a cooperative witness for the defense.   [*Id.*].   "It was within the range of reasonableness for [Mr. Monroe] to spend his time on other preparations for trial instead of on trying to interview an uncooperative witness."   *Ellis v. Raemisch*, 872 F.3d 1064, 1088 (10th Cir. 2017).   Further, Mr. Monroe avers as follows:

> I did not believe that the testimony of either Mr. Pitts or Littlefield would undercut the basic theory of the government's case – that Mr. Gorrell had used the named investors' funds in a manner about which they did not know and which they did not authorize, and that after all was said and done those moneys were gone.   The essence of the defense was to try to establish through cross-examination that in fact the named investors were aware of what Mr. Gorrell was doing with their funds (as to the wire fraud charges) and that Mr. Gorrell was doing all he could to pay the right amount of taxes (as to the evasion charges).

---

[7] In reply, Mr. Gorrell disputes that Mr. Monroe contacted Mr. Pitts, but offers no evidence in this regard.   [Doc. 115, p. 61].

[Doc. 114-1, pp. 11-12, ¶ 17].   As will be more fully discussed herein, based on the court's review of the record, Mr. Monroe conducted a reasonable investigation of the charges against Mr. Gorrell and made the strategic decision not to pursue testimony from Mr. Pitts or Mr. Littlefield as such testimony would not be helpful to Mr. Gorrell's defense.   Mr. Monroe's decision was reasonable under the circumstances.   *See Strickland,* 466 U.S. at 690 ("[S]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable.").

Second, at trial, Mr. Monroe, in fact, tried to introduce Mr. Gorrell's contention that the government arbitrarily classified Mr. Pitts and Mr. Littlefield as non-investors.   During the cross-examination of Internal Revenue Service Criminal Investigation Special Agent Tanner Sanders, Mr. Monroe questioned Agent Sanders regarding the government's characterization of Mr. Littlefield and Mr. Pitts as "non-investors" in Government Exhibit O1-15 and the nature of their investments with Mr. Gorrell.   [Doc. 94, pp. 130-32, 138-42, 145-47].   Likewise, Mr. Monroe extensively questioned IRS Revenue Agent Brian Miller regarding Government Exhibit O1-15 and the classification of Mr. Littlefield's and Mr. Pitt's monies therein.   [Doc. 95, pp. 133-155].   In fact, Mr. Monroe questioned Agent Miller as to whether Mr. Pitts was an investor and if, by limiting "investors" to only those individuals who testified at trial, it was misleading to the jury to "artificially create categories of people when that category is actually larger in scope than you're allowing" [*Id.* at p. 139].   Mr. Monroe also asked whether Agent Miller whether there was "any problem with classifying Mr. Pitts and Mr. Littlefield differently than Cooper and the others." [*Id.* at p. 142].[8]   Thus, Mr. Monroe sought to illicit testimony regarding Mr. Gorrell's proposed

---

[8] Mr. Gorrell alleges that Mr. Monroe "fumbled through the cross examination."   [Doc. 105, p.

theory of defense.

Finally, Mr. Gorrell cannot establish that any additional evidence or testimony regarding the role of Mr. Pitts and Mr. Littlefield would have altered the result of the proceeding.  As explained by Agent Sanders, regardless of how the funds were classified, the overwhelming evidence presented by the government demonstrates that Mr. Gorrell spent all of Drs. Cooper, Sessom, and Southard's funds and never repaid the monies.  *See* [Doc. 94, pp. 117-28; Doc. 114-3, pp. 10-13].  It is well-established that the "the performance of defendant's counsel 'must be considered in light of the strength of the government's case.'"  *United States v. Rivera*, 900 F.2d 1462, 1474 (10th Cir. 1990) (quoting *Eggleston v. United States*, 798 F.2d 374, 376 (9th Cir. 1986)).  "When, as here, the prosecution has an overwhelming case, 'there is not too much the best defense attorney can do.'"  *Id.* (quoting *United States v. Katz*, 425 F.2d 928, 930 (2d Cir. 1970)).

As for Patrick Gorrell, who did testify during trial, the court will consider Mr. Gorrell's claims with respect to Mr. Monroe's cross-examination in Section F., Failure to Develop and Present Available and Relevant Evidence.

C.     *Failure to Investigate*

Apart from a lack of communication with potential witnesses, Mr. Gorrell alleges that Mr. Monroe otherwise failed to adequately investigate his case.   In *Strickland*, the U.S. Supreme Court recognized that "counsel has a duty to make reasonable investigations or to make a reasonable

---

34].  However, a review of the twenty-page transcript of Mr. Monroe's cross-examination of Agent Miller demonstrates that Mr. Monroe had a solid command of the government's exhibit, with Mr. Monroe challenging Agent Miller's calculations as to specific lines of the document. *See generally* [Doc. 95, pp. 133-55].

decision that makes particular investigations unnecessary.   In any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments."   *Strickland*, 466 U.S. at 691.[9]   Bearing in mind the "heavy measure of deference" owed Mr. Monroe's decisions, the court considers Mr. Gorrell's allegations of error.[10]

Mr. Gorrell faults Mr. Monroe for failing to subpoena Dr. Cooper's emails and phone records, and for failing to "develop leads of Power of Attorney Forms."   [Doc. 105, pp. 16-18; 36-37].   However, Mr. Monroe filed a *Brady* motion which was specifically directed, in part, to emails from Dr. Cooper and power of attorney forms executed by Dr. Cooper and Dr. Chockley.[11] [Doc. 23].   As a result, the government produced power of attorney forms from E*TRADE executed by Dr. Chockley and Dr. Cooper.   [Doc. 90, p. 7].   With respect to emails, Mr. Gorrell

---

[9] The court observes that, particularly in his reply, Mr. Gorrell cites to many capital cases for their discussion of the duty to investigate.   The Tenth Circuit has observed that, "[i]n a capital case the attorney's duty to investigate all possible lines of defense is strictly observed."   *Coleman v. Brown,* 802 F.2d 1227, 1233 (10th Cir. 1986).   Mr. Gorrell's case was not a capital case.   Further, none of the cases on which Mr. Gorrell relies are otherwise factually analogous.

[10] Several of Mr. Gorrell's specific objections included in this section relate to Mr. Monroe's cross-examination of the government's witnesses during trial of this matter.   Accordingly, the court considers the objections in Section F., Failure to Develop and Present Relevant and Available Evidence.

[11] To the extent that Mr. Gorrell contends that Mr. Monroe should have sought power of attorney forms executed by clients other than Drs. Southard, Sessom, Cooper, or Chockley, Mr. Monroe generally concluded that evidence of clients who Mr. Gorrell had not solicited to the Scheme "could not have shed any relevant light on his dealings with the Coopers, Laurie Southard, or Wade Sessom."   [Doc. 114-1, p. 11, ¶ 16].   In his 2255 motion, Mr. Gorrell offers no evidence or argument to establish the materiality of evidence of power of attorney forms executed by other clients.   Thus, Mr. Gorrell fails to demonstrate how the power of attorney forms affected the outcome of the case.   *See Decoster,* 624 F.2d at 211 ("In the real world, expenditure of time and effort is dependent on a reasonable indication of materiality.").

has conceded that he was unable to locate any other emails on his own server.   [*Id.* at p. 8].   Agent Sanders avers that Dr. Cooper, through his personal attorney, informed the government that he had provided all the documentation in his possession associated with Mr. Gorrell and that the government provided those documents to Mr. Monroe in discovery.   [Doc. 114-3, pp. 4-5, ¶ 4]. Further, Dr. Cooper testified that he was unable to find any additional emails during trial on cross-examination by Mr. Monroe.   [Doc. 92, pp. 156-58].

Given that Mr. Gorrell himself has been unable to locate any additional emails from Dr. Cooper, he fails to show that Mr. Monroe's decision to file a *Brady* motion and trust in the government's representations was anything but reasonable.   Further, absent evidence that any additional evidence existed which could have been presented to the jury, Mr. Gorrell cannot establish that he was prejudiced.   *Barrett*, 797 F.3d at 1214 (quoting *Rushin,* 642 F.3d at 1302) (prejudice requires showing "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different").[12]

Mr. Gorrell also asserts that Mr. Monroe should have investigated his departure from Northwestern Mutual, including obtaining a document that was a mutual termination agreement between Gorrell and the company.   [Doc. 105, p. 42].   However, the Mutual Agreement of Contract Termination was admitted by agreement [Doc. 46-3, p. 12], and Mr. Monroe cross-examined Northwestern Mutual supervisor Philip Franczyk regarding the documents as well as the circumstances surrounding Mr. Gorrell's departure from Northwestern Mutual, during trial.

---

[12] Insofar as Mr. Gorrell contends that a *Brady* violation occurred, as previously recognized by this court, *Brady* does not require the government to produce documents that it does not have and to which it has no knowledge.   [Doc. 90, pp. 12-13 (citing *United States v. Hoyle,* 751 F.3d 1167, 1172 (10th Cir. 2014); *United States v. Erickson*, 561 F.3d 1150, 1163 (10th Cir. 2009))].

[Doc. 91, pp. 42-47].

Mr. Gorrell raises numerous allegations that Mr. Monroe failed to adequately investigate the "money trail," including the circumstances surrounding Dr. Southard's decision to transfer IRA accounts for her children from Allianz to IRA Services; an entity known as First Insurance Funding; and financial transactions involving Mr. Gorrell's other clients.   [Doc. 105, p. 18, 43]. Mr. Gorrell does not adequately explain the potential relevance, much less the potential exculpatory effect, of this evidence.   Nor does Mr. Gorrell submit any of the documents regarding these accounts and transactions for the court's review.   Based solely on Mr. Gorrell's assertions, it appears that much of the information that Mr. Gorrell describes relate to transactions and accounts wholly separate from the transactions charged.   The Constitution does not require that defense counsel leave no stone unturned.   *See Decoster,* 614 F.2d at 87.   Regardless, considering the information in light of the totality of the evidence presented by the government, Mr. Gorrell fails to demonstrate that a reasonable probability existed that, but for the failure to present the evidence, the result of his case would have been different.   *See Barrett,* 797 F.3d at 1229.

Similarly, Mr. Gorrell claims that Mr. Monroe failed to investigate "what a margin or margin call was before trial" and "the wide number of trades that day traders may execute in any given day."   [Doc. 105, p. 45].   Mr. Gorrell's allegations in this regard are conclusory, unsupported, and do not demonstrate that the outcome of the trial would have been different.   This is insufficient.   *See United States v. Fisher*, 38 F.3d 1144, 1147 (10th Cir. 1994).

Mr. Gorrell also contends that Mr. Monroe should have "investigated" the history of his victims—Drs. Cooper, Chockley, Sessom, and Southard—because additional evidence would have demonstrated that Mr. Gorrell did not force or pressure his clients to move their money.

Based on the court's review, Mr. Gorrell's argument is more fairly characterized as a challenge to Mr. Monroe's cross-examination and impeachment of the witnesses and, as such, will be considered in Section F., Failure to Develop and Present Available and Relevant Evidence. Likewise, Mr. Gorrell criticizes Mr. Monroe's cross-examination of Agent Miller, which will be considered in Section F., as will Mr. Gorrell's challenge to Mr. Monroe's treatment of the W2-G forms offered as exhibits by the government during trial.

D.      *Failure to Subject the Government's Case to the Adversarial Testing Process*

In this general objection, Mr. Gorrell raises three primary criticisms of Mr. Monroe's defense:   (1) Mr. Monroe did not prepare sufficient separate defense exhibits but, instead, relied on the government's exhibits; (2) Mr. Monroe did not contact or call any witnesses for the defense; and (3) Mr. Monroe stipulated to the admission of thousands of pages of government exhibits.[13]

First, with respect to Mr. Monroe's decision to stipulate to the admission of the majority of the government's exhibits, Mr. Monroe explained his reasoning as follows:

> [W]e did agree, in the course of a lengthy pre-trial meeting with the government, not to object to many of the government's exhibits.   This manner of conferring and agreeing to government exhibits was the result of my years of experience of trying cases.   As an experienced litigator, I know that it does no good for a party that I represent to object to exhibits that undoubtedly will be admitted for the jury's consideration, just for the sake of objecting.   It is a waste of the Court's time, the jurors' time, and counsels' time.   On the other hand, I did not agree to the admission of several key government exhibits, and for these the government had to walk through the steps of obtaining their admission in the presence of the Court and jury. . . .   These included government summaries and certain casino records, about which I made specific inquiries and challenges during the course of their being offered.

---

[13]  In this section, Mr. Gorrell also criticizes Mr. Monroe's cross-examination of Dr. Cooper and his alleged failure to "refute the comment made by the prosecution that buying and selling options is the equivalent of 'playing cards' in the stock market."   [Doc. 105, pp. 31-32].   However, Mr. Gorrell fails to adequately explain how this single statement affected the outcome of trial.

[Doc. 114-1, pp. 9-10, ¶ 13].[14]   Here, the majority of the exhibits admitted by agreement consisted of documents reflecting various wire transfers, financial account statements, and communications between Mr. Gorrell and his investors.   *See generally* [Doc. 46-3].   While Mr. Gorrell objects to the government's *characterization* of these transactions and communications, he does not dispute that they occurred.   It is not unreasonable to stipulate to the admission of exhibits where "[a] competent attorney would have no reason to question the authenticity, accuracy, or relevance of th[e] evidence."   *Cronic*, 466 U.S. at 664.

Mr. Gorrell also claims that Mr. Monroe "never challenged the validity of the material being used by the prosecution."   [Doc. 105, p. 31].   His claim is not supported by the record. Mr. Monroe required the government to satisfy evidentiary requirements or objected to over thirty of the government's exhibits, including Exhibit O1-15, the IRS Summary exhibit most criticized by Mr. Gorrell in his § 2255 motion for its alleged failure to accurately characterize investor versus non-investor funds.   *See, e.g.,* [Doc. 46-3; Doc. 92, pp. 79-81, 88-89; Doc. 93, pp. 226-29 (*voir dire* regarding Government Exhibit D1-06); Doc. 94, pp. 46-47 (*voir dire* regarding Government Exhibits D2-01, D2-03, D2-04 and objection as to relevancy); Doc. 94, pp. 70-71, 74-75, 77-78, 82, 88-91, 93-99, 103-07; 111-14, 126; Doc. 94, pp. 163-67 (objection to Government Exhibit M1-15, Tax Defense Network intake record); Doc. 95, pp. 100-03, 119-21 (*voir dire* as to Government Exhibits O3-01, O3-02, O3-03, and O3-04)].[15]

---

[14]  Mr. Gorrell states that "Mr. Monroe stipulated to *all* of the prosecution's exhibits."   [Doc. 105, p. 33 (emphasis added)].   Mr. Gorrell's assertion is false.   *See generally* [Doc. 46-3].

[15]  Mr. Gorrell also alleges that Mr. Monroe learned of the government's exhibits for the first time in January of 2018 and therefore necessarily spent insufficient time reviewing the government's exhibits before trial.   [Doc. 105, p. 15; *see also id.* at p. 34].   However, the government's exhibits

Second, as to Mr. Gorrell's contention that "it is safe to say [Mr. Monroe] should have had some defense exhibits derived from these same 16,000 pages of discovery," Mr. Gorrell directs the court to no constitutional requirement that defense counsel craft independent exhibits, nor has the court identified any.[16]   [Doc. 105, p. 31; *see also id*. at pp. 18, 29].   Indeed, it is the government's burden to prove a defendant's guilt beyond a reasonable double.   Further, a requirement to craft defense exhibits would be unduly burdensome in cases (like Mr. Gorrell's) where a competent attorney such as Mr. Monroe has no reason not to rely on the authenticity, accuracy, or relevancy of the transactions illustrated.   *See Cronic*, 466 U.S. at 664.

Nor has Mr. Gorrell demonstrated that his proposed "exhibits" would have altered the outcome of trial.   As clearly and succinctly explained by Mr. Sanders based on his review of Mr. Gorrell's proposed "exhibits," "[a]t the end of the day, the crucial fact is that the investor funds and non-investor funds, however categorized, were all gone."   [Doc. 114-3, p. 13, ¶ 21].

Third, Mr. Gorrell argues that Mr. Monroe failed to subject the prosecution's case to adversarial testing by failing to interview or put forth any witnesses.   In this regard, he refers the

---

included the discovery which had previously been provided to, and reviewed by, Mr. Monroe. Further, Mr. Monroe requested and received from the government a preliminary exhibit list from the government on December 11, 2017.   [Doc. 114-1, p. 9, ¶ 12; Doc. 114-1, pp. 51-59].   Thus, Mr. Gorrell is incorrect that Mr. Monroe knew nothing of the government's exhibits until January 15, 2018, and, based on the record, Mr. Monroe's handling of the government's exhibits was within the bounds of professionally reasonable conduct.

[16] The court is mindful of the U.S. Supreme Court's admonition:   "The availability of intrusive post-trial inquiry into attorney performance or of detailed guidelines for its evaluation would encourage the proliferation of ineffectiveness challenges.   Criminal trials resolved unfavorably to the defendant would increasingly come to be followed by a second trial, this one of counsel's unsuccessful defense.   Counsel's performance and even willingness to serve could be adversely affected.   Intensive scrutiny of counsel and rigid requirements for acceptable assistance could dampen the ardor and impair the independence of defense counsel, discourage the acceptance of assigned cases, and undermine the trust between attorney and client."   *Strickland,* 466 U.S. at 690.

court to his section discussing the alleged failure to subpoena and interview key reasons.   Thus, for the reasons discussed by this court in Section B., above, Mr. Gorrell fails to demonstrate ineffective assistance of counsel in this regard.

E.      *Failure to Utilize Expert Witness*

Mr. Gorrell next argues that counsel's trial performance was deficient because he did not call Gretchen K. Archer, certified public accountant, to testify as an expert on his behalf.   Mr. Gorrell claims that Mr. Monroe was "supposed to" do so and that Ms. Archer would have testified to "several fundamental errors in the spreadsheets and flowcharts the prosecution presented," particularly with regard to "the legitimacy of Pitts and Littlefield being investors."   [Doc. 105, p. 28].   Again, Mr. Gorrell's claims are without basis.

The Tenth Circuit has recognized that "[t]he decision of which witnesses to call is quintessentially a matter of strategy for the trial attorney" and, further, "[t]he selection of an expert witness is a paradigmatic example of the type of strategic choice that, when made after thorough investigation of the law and facts, is virtually unchallengeable."   *Barrett,* 797 F.3d at 1214.

Mr. Monroe retained Ms. Archer, a former IRS revenue agent, to assist in his understanding of the "movement of funds in the investment part of the government's case."   [Doc. 114-1, p. 7, ¶ 9].

Ms. Archer avers that she was not hired to testify as an expert witness in Mr. Gorrell's case. [Doc. 114-2, p. 3, ¶ 5].   Of his decision to use Ms. Archer only for trial preparation and not ask that she testify, Mr. Monroe avers:

> When we prepared for and engaged in the trial, I did not believe that Ms. Archer would be able to testify in any way that would effectively enhance Mr. Gorrell's defense, either in regard to the fraud or tax evasion charges.   Although she might have been able to challenge the government's classification of Mr. Pitts and Mr.

27

Littlefield as "non-investors," I understood that the fundamental problem for the defense was the expenditure of all funds by Mr. Gorrell, regardless of the classifications made by the government, and Ms. Archer could not have explained that fact advantageously for Mr. Gorrell.  Rather, I thought it was better to make those challenges through the cross-examination of the government's own witnesses.  Presentation of Ms. Archer as a defense witness would subject her to cross-examination, which would run the substantial risk of providing the government with an opportunity to re-inforce aspects of its case without a greater benefit to Mr. Gorrell's defense, especially given the documentary foundation of the government's case.  Moreover, it is my understanding that Ms. Archer asked Mr. Gorrell himself a number of times for additional information about financial transactions pertinent to the case, but he failed to provide that information to her.  Because Ms. Archer did not have all of the information she requested from Mr. Gorrell, the government might well have been able to cross-examine her about her own difficulties in obtaining information from Mr. Gorrell, which would supplement its evidence concerning Mr. Gorrell's interactions with Tax Defense Network, to the detriment of the defense.

[Doc. 114-1, pp. 7-8, ¶ 10].   For the reasons discussed herein, Mr. Monroe conducted a reasonable investigation of both the law and facts in Mr. Gorrell's case.   Based on his understanding of the case, Mr. Monroe made the informed decision that Ms. Archer should not testify at trial.   The court is "satisfied that the decision [not] to call [Ms. Archer] was a strategic choice within the bounds of professionally reasonable conduct."  *Barrett,* 797 F.3d at 1214.[17]

F.   *Failure to Develop and Present Available and Relevant Evidence*

This claim relates to allegations that Mr. Monroe's performance *during trial* of this matter was constitutionally deficient.

1.   Cross Examination of Witnesses

First, Mr. Gorrell offers many criticisms of Mr. Monroe's cross-examination of the government's witnesses.   As recognized above, "the manner in which counsel cross-examines a

---

[17] Moreover, the court notes that Mr. Gorrell cannot establish prejudice as, although Ms. Archer cannot recall many of the exact details of Mr. Gorrell's case, she suggests she would not have testified in the manner that Mr. Gorrell claims.   [Doc. 114-2, pp. 5-6, ¶¶ 8-10].

particular witness is a strategic choice and therefore 'virtually unchallengeable.'" *Kessler v. Cline,* 335 F. App'x 768, 770 (10th Cir. 2009) (unpublished) (quoting *Strickland,* 466 U.S. at 690). Nevertheless, the court considers Mr. Gorrell's specific assertions, beginning with his allegations related to Mr. Monroe's cross-examination of investors Dr. Cooper, Dr. Sessom, and Dr. Southard.

a.    Dr. Cooper

With respect to Dr. Cooper, Mr. Gorrell first alleges that Mr. Monroe did not question Cooper regarding a loan from the doctor to Gorrell and a life settlement insurance policy. [Doc. 105, p. 18, 31]. However, Mr. Monroe did question Dr. Cooper regarding the life settlement policy and loan during cross-examination. [Doc. 92, pp. 152-53] Further, Mr. Gorrell cannot establish prejudice because, regardless of whether investments were being bought and sold apart from Tax Credit Investments, the evidence would not disprove the testimony that monies were used in a manner he did not authorize and that Mr. Gorrell spent all the funds.

Mr. Gorrell also asserts that Mr. Monroe did not adequately cross-examine or impeach Dr. Cooper regarding his knowledge of options trading. Again, Mr. Gorrell ignores clear cross-examination by Mr. Monroe of Dr. Cooper regarding his knowledge of options trading, including whether he had reviewed the investment activity or received statements. [Doc. 92, pp. 145-46, 158-60]. Further, Mr. Gorrell offers no explanation as to how Mr. Cooper's knowledge of options trading would have disproven the government's theory or otherwise changed the trial outcome.

Similarly, Mr. Gorrell contends that Mr. Monroe should have offered evidence of Dr. Cooper's financial history as "proof" that Mr. Gorrell did not pressure Dr. Cooper to move his money from the Allianz annuities. [Doc. 105, pp. 37-38, 42-43]. However, Mr. Monroe did cross-examine Dr. Cooper regarding many of the topics raised by Mr. Gorrell, including whether

29

Mr. Gorrell approached Dr. Cooper as to changing the character of his investments or vice versa. [Doc. 92, pp. 143-45, 148, 150]   Further, Mr. Gorrell fails to explain how Dr. Cooper's authorization of the initial transaction exculpates him for his subsequent use of the funds for unauthorized purposes.

Lastly, Mr. Gorrell suggests that Mr. Monroe erred in failing to introduce certain character evidence regarding Dr. Cooper.   [Doc. 105, p. 20].   However, Mr. Gorrell shows neither that the evidence would have been admissible nor that it would have been sufficient to change the outcome of the proceedings.

### b.    Dr. Sessom

Similarly, Mr. Gorrell suggests that Mr. Monroe should have sought to introduce evidence that Dr. Sessom was not pressured into moving his money.   [Doc. 105, pp. 38, 42-43].   Again, Mr. Monroe elicited testimony on cross-examination regarding Dr. Sessom's motives for shifting money from the Allianz accounts.   [Doc. 93, pp. 110-12; 115-16].   Further, although Mr. Gorrell suggests that Mr. Monroe should have offered character evidence related to Dr. Sessom, he again fails to show that the evidence would have been admissible or swayed the proceedings.

### c.    Dr. Southard

Mr. Gorrell also criticizes Mr. Monroe's handling of Dr. Southard.   Mr. Gorrell first asserts that Mr. Monroe was deficient by failing to elaborate on the fact that Dr. Southard kept her investments with Mr. Gorrell even after the incident at Northwestern Mutual.   The record reflects that the government explored this issue in direct.   [Doc. 93, pp. 33-42].   Further, Mr. Monroe raised the Northwestern Mutual incident with Dr. Southard in cross-examination.   [Doc. 93, pp. 66-67].   In light of the record, Mr. Gorrell does not adequately explain how any additional

evidence would have affected the outcome of trial.

Similarly, Mr. Gorrell offers a lengthy discussion of both Dr. Southard's investment and marital history, which he contends Mr. Monroe should have explored during cross-examination. Again, some information that Mr. Gorrell claims should have been investigated was elicited by the government during direct examination.   [Doc. 93, pp. 42-45, 48-51].   Further, Mr. Monroe cross-examined Dr. Southard regarding her divorce and its impact on her finances.   [Doc. 93, pp. 65, 68].   Insofar as Mr. Gorrell contends that Mr. Monroe should have explored the financial history of Dr. Southard's ex-husband, he fails to demonstrate the relevance of the evidence to his case. In light of the record detailing Dr. Southard's financial distress due to her divorce, Mr. Gorrell does not adequately explain how any additional evidence of Dr. Southard's self-described "desperation" (or her character) would have affected the outcome of trial.

### d.   Agent Miller

Apart from the investors, Mr. Gorrell claims that Mr. Monroe failed to adequately cross-examine IRS Revenue Agent Brian Miller.   [Doc. 105, pp. 43-44].   Mr. Gorrell first criticizes Mr. Monroe for failing to question Agent Miller regarding the fact that Mr. Gorrell over-reported his income in tax year 2010, arguing that the over-reporting "in it of itself, would have shown the court that Gorrell was not trying to evade taxes."   [Doc. 105, p. 43].   However, Mr. Gorrell was not charged with tax evasion in 2010.   It does not logically follow that, because Mr. Gorrell over-reported his income in 2010, he could not have inaccurately reported his income in prior or subsequent years.   Regardless, on cross-examination, Mr. Monroe specifically elicited testimony from Agent Miller that Mr. Gorrell overpaid in tax year 2010.   [Doc. 95, p. 155].

Mr. Gorrell next contends that Mr. Monroe failed to question Agent Miller regarding Mr.

31

Pitts' status as an investor and other investments undertaken by Drs. Cooper, Southard, and Sessom, but Mr. Monroe did in fact do so in twenty pages of cross-examination.   [Doc. 95, pp. 135-155]

Finally, Mr. Gorrell asserts that Mr. Monroe erred in his handling of Agent Miller through his "refusal to put the defense's own expert, Gretchen Archer, on the stand."   [Doc. 105, p. 44]. However, for the reasons discussed above, Mr. Monroe's strategic decision in this regard fell within the bounds of objectively reasonable professional conduct.

e.     Patrick Gorrell

As discussed above, Mr. Gorrell also criticizes Mr. Monroe's cross-examination of Mr. Gorrell's father, Patrick Gorrell.   [Doc. 105, p. 25].   Specifically, Mr. Gorrell argues that Mr. Monroe failed to establish that Mr. Gorrell paid back a loan made by Patrick Gorrell to him, resulting in an unfavorable impression of his character, or question Patrick Gorrell regarding Mr. Cooper bringing money back from Costa Rica or placing a large sum of cash on Patrick Gorrell's desk   However, Mr. Monroe elicited testimony during cross-examination that the loan from Patrick Gorrell, as well as Bank of Oklahoma, was fully paid.   [Doc. 95, p. 54].   Mr. Monroe also questioned Patrick Gorrell regarding Mr. Cooper's finances including an instance when Mr. Cooper came to Patrick Gorrell's office with over $20,000 cash and monies received from Costa Rica.   [*Id.* at pp. 59-61].   Regardless, "the manner in which counsel cross-examines a particular witness is a strategic choice and therefore 'virtually unchallengeable.'"   *Kessler,* 335 F. App'x at 770 (quoting *Strickland,* 466 U.S. at 690).   Mr. Gorrell therefore fails to establish that Mr. Monroe's representation fell below an objective standard of reasonableness or prejudice therefrom.

f.      Meredith Gray

Finally, Mr. Gorrell asserts that Mr. Monroe was deficient in his questioning of a casino employee, Meredith Gray, as to the signatures on five W2-G forms.   [Doc. 105, p. 40].   In this regard, it appears that Mr. Gorrell is referring to five W-9 Forms, which were introduced as Government Exhibit D1-03.   [Doc. 46-3, p. 6].   However, Mr. Monroe extensively cross-examined Ms. Gray regarding the forms and, specifically, the signatures thereon.   [Doc. 94, pp. 5-22].

2.      Exhibits

Mr. Gorrell claims deficiency based on Mr. Monroe's decision not to seek admission of certain exhibits, including a client list [Doc. 105, p. 17], emails from Tax Defense Network [Doc. 105, p. 19], evidence of other investments taken on by Dr. Southard, Dr. Cooper, and Dr. Sessom [Doc. 105, p. 17, 30, 32, and 41], and evidence that "Gorrell had sufficient income to cover his [gambling] losses during the years in question" [Doc. 105, p. 19].

First, with respect to the client list, Mr. Gorrell contends that it would have demonstrated that some of his clients knew nothing of the Tax Credit Funding Group, the primary investment at issue during trial.   However, that Mr. Gorrell did not defraud some of his clients is not indicative as to whether he defrauded Drs. Cooper, Sessom, and Southard.   Thus, Mr. Gorrell fails to show that evidence of the client list would have affected the outcome of the trial.

Next, with respect to the emails from Tax Defense Network, Mr. Gorrell asserts that "over 100 emails between their firm and Mr. Gorrell" would have "proved that he was trying to figure out his taxes so that he could pay them, not avoid paying them."   [Doc. 105, p. 19].   The court notes that Mr. Gorrell fails to provide any of these emails to substantiate his claim.   Further, the

33

government submitted a large log of its communications with the Gorrells as Government Exhibit M1-14.   [Doc. 114-1, p. 10; ¶ 14; Doc. 94, p. 178].   Although Mr. Gorrell claims that Mr. Monroe permitted the prosecution to present evidence that Mr. Gorrell was difficult to contact and tried to hide things from Tax Defense Network, in fact, during his cross-examination of Tax Defense Network supervisor Mark Giles and employee Naydali Maldonado-Hurst, Mr. Monroe elicited testimony that Tax Defense Network did eventually receive all the requested documentation and prepared the returns.   [Doc. 94, pp. 184-88, 216].

As for evidence of other investments taken on by Dr. Cooper, Dr. Southard, and Dr. Sessom, as discussed above, Mr. Gorrell fails to explain the relevancy of the evidence or how it would have affected the outcome of trial.   Although Mr. Gorrell contends that it would have explained the "money trail," regardless of Mr. Gorrell's calculations, at the end of the day, the investor funds were all gone.   [Doc. 114-3, p. 13].   For the same reasons, the court finds no deficiency in Mr. Monroe's decision not to try to illicit evidence that Mr. Gorrell had sufficient funds to cover his gambling debts.   The record establishes that Mr. Gorrell did not.

For all of these reasons, Mr. Gorrell fails to demonstrate that Mr. Monroe's performance during trial was constitutionally deficient.

G.   *Sentencing Guidelines and Potential Plea Agreement*

Finally, Mr. Gorrell alleges that Mr. Monroe (1) did not inform him of his potential sentence if convicted, and (2) did not explain the plea process to Mr. Gorrell.

First, Mr. Gorrell's contention that Mr. Monroe did not accurately inform him of his potential sentence is false.   Mr. Gorrell claims that Mr. Monroe told him that he would be facing "a couple of years if he went to trial" but, "[a]s it turned out, Gorrell was facing 57-71 months if

34

he went to trial and lost."   [Doc. 105, pp. 40-41].   However, in a November 17, 2017 email to

Mr. Gorrell, Mr. Monroe stated as follows:

> Shawn,
>
> Without trying to make this too complicated, if the jury does find you guilty of all counts, then the judge must consult the applicable sentencing Guidelines.   Since the "offense" was completed in [2012], the rule is that the court should look at the Guidelines in effect at the time of the offense & the Guidelines in effect at the time of the sentencing hearing, and use the one most favorable to the defendant.   In your case, the current Guidelines manual is slightly more favorable for you.
>
> Remember, the following is only an estimate of what the exposure might be. According to my calculations, you are facing a possible sentence of incarceration of 57-71 months in prison if convicted of all counts.   If you are convicted of only the fraud counts, but not guilty of the tax counts, then I estimate the range to be 46-57 months; if you are acquitted of the fraud counts but convicted of the tax counts, then you'd be facing 51-63 months.   Again, these are estimates.
>
> So, there you have it.   If you want me to drill a little deeper into the Guidelines, I'll spend more time.
>
> Stan

[Doc. 114-1, p. 73; Doc. 114-1, pp. 12-13, ¶ 18].   The Presentence Investigation Report prepared

after Mr. Gorrell's conviction as to all counts also calculated Mr. Gorrell's Guideline range as 57

to 71 months.   Thus, it is clear Mr. Monroe did accurately inform Mr. Gorrell of his potential

sentence if convicted.

As for Mr. Gorrell's claim that Mr. Monroe did not explain the plea process to him, a

defendant claiming that his trial counsel was deficient in explaining the potential benefits of a plea

bargain, "must point to particular failings in that advice."   *Cox,* 782 F. App'x at 677.   As

discussed above, Mr. Gorrell's contention that Mr. Monroe did not accurately advise him of his

potential sentence if convicted is demonstrably false.   Additionally, Mr. Gorrell points out that

Mr. Monroe "never told Gorrell that the conviction rate in Federal cases were more than 97%,"

[Doc. 105, p. 40], but that statistic is not accurate for either 2017, the year in which Mr. Gorrell was charged, or 2018, the year of his trial.   *See* Table 5.4 U.S. District Court—*Criminal Defendants Disposed of, by Method of Disposition, During the 12-Month Periods Ending June 30, 1990, and September 30, 1995 Through 2019*, Annual Report of the Director: Judicial Business of the United States Courts.   Finally, Mr. Gorrell alleges that Mr. Monroe did not present him the strengths and weaknesses of his defense such that he could make a decision as to whether to go to trial.   However, Mr. Monroe avers that he did discuss the option of pleading guilty with Mr. Gorrell, but that Mr. Gorrell insisted upon going to trial.   [Doc. 114-1, pp. 13-14, ¶¶ 19-20].[18] Even assuming that Mr. Monroe did not, Mr. Gorrell's claim for ineffective assistance of counsel in this regard fails because Mr. Gorrell cannot establish prejudice as a result.

"If '[h]aving to stand trial, not choosing to waive it, is the prejudice alleged,' a defendant must demonstrate a reasonable probability that he would have pled guilty 'and that the conviction or sentence . . . would have been less severe than under the judgment and sentence that in fact were imposed.'"   *United States v. Robles,* 546 F. App'x 751, 753 (10th Cir. 2013) (unpublished) (quoting *Lafler v. Cooper*, 566 U.S. 156 (2012)); *see also Rosin v. United States*, 786 F.3d 873, 878 (11th Cir. 2015).   Mr. Gorrell does not assert that he would have pled guilty but for Mr. Monroe's advice, nor would the record support such an assertion.

---

[18] In reply, Mr. Gorrell makes much of a perceived discrepancy between Mr. Monroe's affidavit, the government's response, and a letter presented to the Oklahoma Bar Association by Mr. Monroe. [Doc. 115, pp. 31-34].   Mr. Gorrell's argument, however, rests on the premise that Assistant U.S. Attorney Kevin Leitch stated in his response to Mr. Gorrell's § 2255 motion that no plea offer was ever extended.   Mr. Leitch makes no such representations in the response.   *See generally* [Doc. 113].   Further, the court perceives of no discrepancies in Mr. Monroe's statement to the Oklahoma Bar Association that a plea agreement was offered, but rejected, [Doc. 114-1, p. 77], and his averment that the government continued to express interest in negotiating a plea deal up to trial.   [Doc. 114-1, p. 14, ¶ 20].

H.     Summary

Mr. Gorrell raises many specific errors, all of which this court has endeavored to address. However, having presided over Mr. Gorrell's trial and personally observed the government's case-in-chief and Mr. Monroe's testing of that case, and having reviewed the record presented with respect to Mr. Gorrell's motion, the court would be remiss not to reiterate that "the performance of defendant's counsel 'must be considered in light of the strength of the government's case.'" *Rivera*, 900 F.2d at 1474 (quoting *Eggleston*, 798 F.2d at 376).   Here, the government presented twenty-seven witnesses over the course of six days, including Mr. Gorrell's victims, investigating government agents, and Mr. Gorrell's own family members.   Thousands of pages of exhibits were admitted by stipulation.   Further, the court admitted thirty-two exhibits offered by the government over defendant's objection.   Mr. Monroe, a seasoned trial attorney, challenged the government's evidence where reasonable and attempted to rebut the case by offering evidence of Mr. Gorrell's defense theories.   However, the evidence overwhelming demonstrated that Mr. Gorrell was guilty of the crimes charged.   "Where, as here, the prosecution has an overwhelming case, 'there is not too much the best defense attorney can do.'"   *Id.* (quoting *Katz*, 425 F.2d at 930).   The fault for Mr. Gorrell's conviction lies not with Mr. Monroe, but with Mr. Gorrell himself.

## IV.   Certificate of Appealability

Rule 11 of the *Rules Governing Section 2255 Cases in the United States District Courts* instructs that "[t]he district court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant."   The court may issue a certificate of appealability "only if the applicant has made a substantial showing of the denial of a constitutional right," and the court "indicate[s] which specific issue or issues satisfy [that] showing."   28 U.S.C. § 2253.   That

standard demands that the issues raised be debatable among reasonable jurists, that a court could resolve the issues differently, or that the questions deserve further proceedings.   *Slack v. McDaniel*, 529 U.S. 473, 484 (2000); *United States v. Blackstock*, No. 06-CR-62-TCK, 2012 WL 3646936, at *2 (N.D. Okla. Aug. 23, 2012).   Here, the court denies a certificate of appealability as the record is devoid of any authority suggesting that the Tenth Circuit Court of Appeals would resolve the issues in this case differently.

## V.   Conclusion

WHEREFORE, the Motion Under 28 U.S.C. § 2255 to Vacate, Set Aside, or Correct Sentence by a Person in Federal Custody [Doc. 105] of defendant/petitioner Shawn Christopher Gorrell is denied.   A certificate of appealability is also denied.

DATED this 10th day of March, 2021.

GREGORY K. FRIZZELL
UNITED STATES DISTRICT JUDGE